1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Harold A. Barza (Bar No. 80888)
2    halbarza@quinnemanuel.com
     Bruce E. Van Dalsem (Bar No. 124128)
3    brucevandalsem@quinnemanuel.com
     Ian S. Shelton (Bar No. 264863)
4    ianshelton@quinnemanuel.com
     Matthew S. Hosen (Bar No. 291631)
5    matthosen@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017
   Telephone:   (213) 443-3000
7  Facsimile:   (213) 443-3100

8  *Of Counsel:*

9  DECHERT LLP
     Robert A. Cohen (admitted *pro hac vice*)
10   robert.cohen@dechert.com
   1095 Avenue of the Americas
11 New York, New York 10036
   Telephone:   (212) 698-3500
12 Facsimile:   (212) 698-3599

13 Attorneys for Plaintiff NML Capital, Ltd.

14

15                **UNITED STATES DISTRICT COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17 | NML CAPITAL, LTD., | CASE NO. 14 CV 02262-SVW-Ex |

18 |                 Plaintiff, | Hon. Stephen V. Wilson |

19 |              vs. | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION** |

20 | SPACE EXPLORATION | **TO MOTIONS BY THE REPUBLIC** |
   | TECHNOLOGIES CORP., aka | **OF ARGENTINA AND SPACEX TO** |
21 | SPACEX, a Delaware corporation; THE | **DISMISS COMPLAINT UNDER** |
   | REPUBLIC OF ARGENTINA, a | **F.R.C.P. 12(b)(1) AND (6)** |
22 | foreign state, including its *COMISIÓN* |

23 | *NACIONAL DE ACTIVIDADES* | Hearing Date:     June 30, 2014 |
   | *ESPACIALES*, aka CONAE, a political | Time:              1:30 p.m. |
   | subdivision of the Argentine State; and | Courtroom:       6 |
24 | DOES 1-10, |

25 |                 Defendants. | Complaint Filed:   March 25, 2014 |

26

27

28

# **<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 4

ARGUMENT ...................................................................................................... 5

I.  The National Commission Is A "Political Subdivision" Of Argentina Under The FSIA And Is Therefore Liable For The Judgments ...................... 5

    A.  The National Commission is a "Political Subdivision" of Argentina, Not an "Agency or Instrumentality" ................................. 6

        1.  The Legal Standards for Assessing whether an Entity is a "Political Subdivision" or an "Agency or Instrumentality" ......... 6

        2.  The National Commission does Not Qualify as an "Agency or Instrumentality" Because it is Not a "Separate Legal Person" Distinct from Argentina ....................................... 7

    B.  The National Commission is Liable for the Judgments against Argentina ...................................................................................... 10

    C.  Argentina's "Agency or Instrumentality" Analysis is Fundamentally Flawed ................................................................... 11

II.  The Launch Services Rights Are Subject To Execution Under The FSIA ...................................................................................................... 15

    A.  Argentina is Using its Contractual Rights Under the Launch Services Contracts for a Commercial Activity in the United States ......................................................................................... 15

    B.  Argentina's Arguments that It is Not Using the Launch Rights for a Commercial Activity are Baseless ................................................. 17

III.  Argentina Has Waived Its Objections To Service Of Process Under Rule 12(b)(5) ....................................................................................... 20

CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

**Page**

## Cases

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
  475 F.3d 1080 (9th Cir. 2007) ................................................................. 18

*AT&T Co. v. Compagnie Bruxelles Lambert*,
  94 F.3d 586 (9th Cir. 1996) ....................................................................... 5

*Aurelieus Capital Partners, LP v. Republic of Argentina*,
  2009 WL 755231 (S.D.N.Y. March 12, 2009) ......................................... 14

*Aurelieus Capital Partners, LP v. Republic of Argentina*,
  584 F.3d 120 (2d Cir. 2009) ............................................................... 18, 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 15

*Brant Point, Ltd. v. Republic of Congo*,
  Index No. 4238/04 (Sup. Ct. Westchester Cnty. Dec. 12, 2006) ............. 20

*Cal. Dep't of Water Res. v. Powerex Corp.*,
  533 F.3d 1087 (9th Cir. 2008) ................................................................. 13

*Capital Ventures Int'l v. Republic of Argentina*,
  2010 WL 1257611 (S.D.N.Y. March 31, 2010) ....................................... 21

*City of Emeryville v. Robinson*,
  621 F.3d 1251 (9th Cir. 2010) ................................................................. 21

*Compagnie Noga D'importation et D'exportation SA v. Russian Fed'n*,
  361 F.3d 676 (2d Cir. 2004) ............................................................... 11, 12

*Connecticut Bank of Commerce v. Republic of Congo*,
  309 F.3d 240 (5th Cir. 2002) ............................................................... 18, 19

*Doe v. Holy See*,
  557 F.3d 1066 (9th Cir. 2009) ................................................................... 5

*EM Ltd. v. Republic of Argentina*,
  473 F.3d 463 (2d Cir. 2007) ..................................................................... 11

*EM Ltd. v. Republic of Argentina*,
  2009 WL 3149601 (S.D.N.Y. Sept. 30, 2009) ......................................... 14

*European Cmty. v. RJR Nabisco, Inc.*,
  --- F.3d ----, 2014 WL 1613878 (2d Cir. Apr. 29, 2014) ....................... 13

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) ........................................................................... passim

NML CAPITAL. LTD.'S OPPOSITION TO MOTIONS TO DISMISS

*Flatow v. Islamic Republic of Iran,*
   308 F.3d 1065 (9th Cir. 2002) ............................................................. 3

*Garb v. Republic of Poland,*
   440 F.3d 579 (2d Cir. 2006) ................................................. 7, 12, 13

*KKE Architects, Inc. v. Diamond Ridge Dev. LLC,*
   2008 WL 637603 (C.D. Cal. Mar. 3, 2008) ....................................... 5

*Ministry of Defense & Support for the Armed Forces of the*
   *Islamic Republic of Iran v. Cubic Defense Sys., Inc.,*
   495 F.3d 1024 (9th Cir. 2007) ................................................. passim

*NML Capital, Ltd. v. Republic of Argentina,*
   680 F.3d 254 (2d Cir. 2012) ............................................... 14, 18

*NML Capital, Ltd. v. Spaceport Sys. Int'l, LP,*
   788 F. Supp. 2d 1111 (C.D. Cal. 2011) ............................... 10, 14

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan,*
   662 F.2d 641 (9th Cir. 1981) .............................................................. 4

*Powerex Corp. v. Reliant Energy Servs., Inc.,*
   551 U.S. 224 (2007) ..................................................................... 12, 18

*Quach v. Cross,*
   2004 WL 2862285 (C.D. Cal. Dec. 3, 2004) .................................. 21

*Rector v. Scott,*
   2014 WL 580158 (C.D. Cal. Feb. 11, 2014) .................................. 21

*Republic of Argentina v. Weltover,*
   504 U.S. 607 (1992) ................................................. 4, 16, 17, 18, 20

*Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic,*
   877 F.2d 574 (7th Cir. 1989) ........................................................... 16

*Schnabel v. Lui,*
   302 F.3d 1023 (9th Cir. 2002) ......................................................... 20

*Siderman de Blake v. Republic of Argentina,*
   965 F.2d 699 (9th Cir. 1992) ....................................................... 3, 10

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
   30 F.3d 148 (D.C. Cir. 1994) ........................................................ 2, 7

## **Statutes**

28 U.S.C. § 1603(b) ............................................................................ passim

28 U.S.C. § 1603(d) .......................................................................... 15, 16

28 U.S.C. § 1610(a) ........................................... 3, 4, 10, 11, 15, 17

-iii-

Fed. R. Civ. P. 12(b)(1) ................................................................ 1, 3, 5, 20, 21

Fed. R. Civ. P. 12(b)(5) ................................................................ 20, 21

Fed. R. Civ. P. 12(b)(6) ........................................................ 1, 15, 20, 21

Fed. R. Civ. P. 12(h)(1) ................................................................ 20, 21

NML CAPITAL. LTD.'S OPPOSITION TO MOTIONS TO DISMISS

| | |
|---|---|
| 1 | **INTRODUCTION** |
| 2 | As a judgment creditor holding over $1.7 billion in valid final judgments |
| 3 | against the Republic of Argentina (the "Judgments"), and faced with Argentina's |
| 4 | vow never to honor those Judgments voluntarily, Plaintiff NML Capital, Ltd. |
| 5 | ("NML") has been forced to pursue collection litigation, including this action, in an |
| 6 | effort to enforce its Judgments.   In this proceeding, NML seeks to enforce those |
| 7 | Judgments by executing on valuable commercial contract rights held by the |
| 8 | Argentine national space administration, known as *Comision Nacional de* |
| 9 | *Actividades Espaciales* (the "National Commission").   The National Commission |
| 10 | has executed one or more contracts with a private, U.S. corporation, Defendant |
| 11 | Space Explorations Technologies Corporation ("SpaceX"), in which the National |
| 12 | Commission agreed to pay SpaceX to launch one or more Argentine-owned |
| 13 | satellites into space using rockets and launch equipment owned and operated by |
| 14 | SpaceX (the "Launch Services Rights").   Through this action, NML seeks to levy |
| 15 | on those contract rights to use SpaceX's rockets and launch services, sell them to |
| 16 | another qualified user, and apply the proceeds against its Judgments.   NML is not |
| 17 | seeking in this action to execute on any Argentine satellite or satellite component. |
| 18 | Argentina, joined by SpaceX, has now moved to dismiss this action, at the |
| 19 | pleading stage, on two separate grounds.   As is shown in detail below, both grounds |
| 20 | are fundamentally flawed, and neither supports dismissal of this action.[1] |
| 21 | *First*, Argentina asserts that the National Commission is not liable on the |
| 22 | Judgments because it is a separate "agency or instrumentality" of Argentina within |
| 23 | the meaning of § 1603(b) of the Foreign Sovereign Immunities Act ("FSIA").   As a |
| 24 | result, it claims, under the Supreme Court's ruling in *First Nat'l City Bank v. Banco* |

---

[1]   Although Argentina purports to move under Fed. R. Civ. P. 12(b)(1) and (6), it does not explain which ground arises under Rule 12(b)(1) and which under Rule 12(b)(6).   NML assumes, for purposes of this opposition, that Argentina is moving under Rule 12(b)(1) as to the first ground and under Rule 12(b)(6) as to the second ground.

-1-

1   *Para El Comercio Exterior de Cuba,* 462 U.S. 611 (1983) ("*Bancec*"), the National

2   Commission is not liable on the Judgments unless NML can establish that the

3   National Commission is the alter-ego of Argentina which, Argentina claims, NML

4   has not done here.

5          Argentina is wrong.   *Bancec*'s test for alter-ego liability is irrelevant to this

6   case because the National Commission is not an "agency or instrumentality" that is

7   separate from the Argentine state.   Rather, because the National Commission is a

8   "political subdivision" of Argentina, the National Commission and Argentina are

9   one and the same, and the National Commission is thus liable for any judgment

10  rendered against Argentina.   Under a legal standard adopted by the Ninth Circuit

11  and numerous other circuits, the resolution of whether a governmental agency is a

12  "political subdivision" or an "agency or instrumentality" is governed by the "core

13  functions test."   *See Ministry of Defense & Support for the Armed Forces of the*

14  *Islamic Republic of Iran v. Cubic Defense Sys., Inc.*, 495 F.3d 1024, 1035 (9th Cir.

15  2007) ("*Cubic*"), *reversed on other grounds*, 556 U.S. 366 (2009).[2]   This test looks

16  to "whether the core functions of the foreign entity are predominantly governmental

17  or commercial."   *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151

18  (D.C. Cir. 1994); *see also Cubic*, 495 F.3d at 1034-35 (citing *Transaero*

19  approvingly).

20         NML's Complaint alleges more than enough to show that the core functions

21  of the National Commission are predominantly governmental.   Its role is to oversee

22  and effectuate the government's "National Space Plan," "which is of great interest

23  for the National state."   It was specifically created to "increase the participation of

24  _____

25  [2]   The Ninth Circuit's holding in *Cubic* regarding the "core functions" test was
    not disturbed by the Supreme Court's decision in that case; indeed, the Ninth

26  Circuit's holding that the Iranian agency was a "political subdivision" based on the
    "core functions" test was itself necessary to the Supreme Court's resolution of the

27  separate issue regarding the attachability of certain Iranian assets.   *See* 556 U.S. at

28  374 (describing *Cubic*'s procedural history).

1  the National Congress in the scheduling and control of national space policy."   It is

2  run by appointed officials from other government ministries and departments.   It

3  reports to the "President of the Nation."   It is not a corporation.   It has no

4  discernible ownership structure.   Its "financing mechanism" must be "approved by

5  the National Executive Branch" and is predominantly if not solely funded by the

6  "national budget" subject to "parliamentary approval," not from its own commercial

7  activities.   Complaint, ¶¶ 21 -25; Exhibit C.

8       Argentina does not even analyze the National Commission under the "core

9  functions" test, instead just saying that that test only applies to government

10  ministries and departments performing core political functions, without any analysis

11  of whether the allegations against the National Commission meet the "core

12  functions" test adopted by the Ninth Circuit.   Properly analyzed, however, the

13  National Commission's core functions are predominantly governmental and

14  therefore, it is a "political subdivision" of Argentina, not its "agency or

15  instrumentality."   As a result, the first ground of Argentina's motion predicated on

16  *Bancec* is without merit, and should be denied.[3]

17       *Second*, Argentina argues that, even if the National Commission is liable on

18  the Judgments, NML cannot execute on the Launch Services Rights because,

19  Argentina claims, these property rights are not being "used for a commercial activity

20  in the United States," as required by 28 U.S.C. § 1610(a).   Specifically, Argentina

21  ─────────────────
[3]   In the alternative, since Argentina seeks dismissal under Rule 12(b)(1), NML
22  is entitled to discovery under Rule 12(b)(1) regarding whether the National
Commission is a "political subdivision" under the "core functions" test, or
23  alternatively whether it is the alter-ego of Argentina.   *See Siderman de Blake v.*
*Republic of Argentina*, 965 F.2d 699, 713 (9th Cir. 1992) ("To the extent that the
24  jurisdictional facts are disputed on remand, the parties should be allowed to conduct
discovery for the limited purpose of establishing jurisdictional facts before the
25  claims can be dismissed."); *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1068
26  (9th Cir. 2002) (denying motion to dismiss without prejudice and allowing
discovery regarding whether an undisputed commercial "agency or
27  instrumentality"—a bank—was the alter-ego of Iran under *Bancec*).
28

1   argues that, because its satellites do not constitute property used for a commercial

2   activity, the separate Launch Services Rights are not being used for a commercial

3   activity.

4           This argument is likewise meritless.   NML seeks to execute on the Launch

5   Services Rights, not on any payload that Argentina might seek to launch were it to

6   retain those rights.   Under the Supreme Court's decision in *Republic of Argentina v.*

7   *Weltover*, 504 U.S. 607, 614 (1992), an activity is commercial if it is the type of

8   action by which a private party engages in trade or commerce.   Thus, "***a contract*** to

9   buy army boots or even bullets is a commercial activity because private companies

10  can similarly use sales contracts."   *Id.* at 614 (emphasis added).   Similarly,

11  Argentina is using the Launch Services Rights for the acquisition and employment

12  of launch services.   And, such acquisition and employment of launch services from

13  a private contractor like SpaceX is commercial activity within the teaching of

14  *Weltover*.   As a result, NML's Complaint properly alleges that the property at issue

15  is property used for commercial activity in the United States, and Argentina's

16  motion on this second ground must also be denied.[4]

17                          **BACKGROUND**

18          NML filed the creditor's suit on March 25, 2014 to enforce two final and non-

19  appealable judgments issued by a Federal Court in New York that are registered in

20  this District.   *See* Complaint, Exhibits A & B.   The Judgments arise out of

21  Argentina's default on scores of billions of dollars of bonds it issued to the public

22  and then repudiated.   NML brings this suit pursuant to Rule 69 of the Federal Rules

---

23      [4]   Because the status of the Launch Service Rights under 28 U.S.C. § 1610(a) is
24  not jurisdictional, the Court cannot rely on evidence beyond the pleadings, including
    Argentina's affidavits, to resolve whether these property rights are used for
25  commercial activity in the United States.   To the extent the Court considers any
26  extrinsic evidence, the motion to dismiss is converted into a motion for summary
    judgment and should be denied because NML is entitled to notice, discovery, and
27  the opportunity to present opposing evidence.   *Portland Retail Druggists Ass'n v.*
28  *Kaiser Found. Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981).

1  of Civil Procedure and Section 708.210 *et seq.* of the California Code of Civil

2  Procedure in order to execute against property of Argentina used for commercial

3  activity in this District—namely, Argentina's valuable contractual rights under its

4  Launch Services Rights with SpaceX.   NML seeks to execute on this property,

5  which will be liquidated by a marshal or receiver, and apply the proceeds towards

6  the satisfaction of the Judgments.   NML accurately pleads that Argentina has

7  waived its immunity from execution in the documents underlying the bonds on

8  which NML's Judgments are based, that the National Commission is a "political

9  subdivision" of the Argentine state, and that the Judgments against Argentina are

10  therefore Judgments against the National Commission for purposes of the FSIA.

11  **ARGUMENT**

12  **I.   The National Commission Is A "Political Subdivision" Of Argentina**

13  **Under The FSIA And Is Therefore Liable For The Judgments**

14          "A defendant who seeks dismissal of a complaint for lack of subject matter

15  jurisdiction under Rule 12(b)(1) can facially challenge the sufficiency of the

16  jurisdictional allegations in the complaint; when this type of attack is mounted, the

17  court must accept as true all well-pleaded facts and draw all reasonable inferences in

18  favor of the plaintiff."   *KKE Architects, Inc. v. Diamond Ridge Dev. LLC*, 2008 WL

19  637603, at * 2 (C.D. Cal. Mar. 3, 2008).   "Alternatively, the party challenging

20  subject matter jurisdiction can proffer evidence extrinsic to the complaint."   *Id.*

21  "Where extrinsic evidence is submitted, the uncontroverted allegations in the

22  complaint must be taken as true, and 'conflicts between the facts contained in the

23  parties' affidavits must be resolved in [plaintiff's] favor . . . .'"   *Id.* (quoting *AT&T*

24  *Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)); *accord*

25  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

26          Under this standard, Argentina's motion to dismiss under Rule 12(b)(1)

27  plainly fails.

28

Argentina intentionally muddles the applicable law under the FSIA in order to make its unsupported argument that the National Commission is an "agency or instrumentality" of Argentina and is therefore immune from liability under *Bancec*. Mot. 1.   Contrary to Argentina's contentions, it is not the law that the term "agency or instrumentality" means different things in the same Act, or that established Ninth Circuit law is in tension with Supreme Court precedent.   Mot. 15.   In an effort to sweep away the confusion caused by Argentina's moving papers, NML discusses the law below.   It then explains why Argentina's analysis is wrong.

**A.** **The National Commission is a "Political Subdivision" of Argentina, Not an "Agency or Instrumentality"**

**1.** **The Legal Standards for Assessing whether an Entity is a "Political Subdivision" or an "Agency or Instrumentality"**

Contrary to Argentina's argument that the meaning of the term "agency or instrumentality" varies depending on the section of the FSIA in which it appears, Mot. 15, an entity does not qualify as an "agency or instrumentality" unless it satisfies three conjunctive elements set forth in the statute.   28 U.S.C. § 1603(b). First, the entity must be a "separate legal person, corporate or otherwise."   *Id.* § 1603(b)(1).   Second, it must be "an organ of a foreign state or political subdivision thereof," or an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."   *Id.* § 1603(b)(2).   Third, it must be "neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country."   *Id.* § 1603(b)(3).   Thus, at a bare minimum, an entity must be a "separate legal person" from the state in order to be defined as an "agency or instrumentality" under the FSIA.

The Ninth Circuit has adopted the "core functions" test to determine whether an entity is a "separate legal person" from the state.   *See Cubic*, 495 F.3d at 1035 (explaining that "whether the entity, here the [Iranian Defense] Ministry, is a

1   'separate legal person'" under § 1603(b)(1) is governed by the "core functions"

2   test); *Transaero*, 30 F.3d at 151 (explaining that "whether the Bolivian Air Force is

3   a 'separate legal person, corporate or otherwise' under section 1603(b)(1)" is

4   governed by the "core functions" test).   Under this test, if the core functions of the

5   entity are predominantly commercial, it is considered a "separate legal person," but

6   if the core functions of the entity are predominantly governmental, it is not.   *Id.*   If

7   an entity is not "a separate legal person" because it performs predominantly

8   governmental functions, then it is a "political subdivision" that is part of the state

9   itself, rather than an "agency or instrumentality."   *See Cubic*, 495 F.3d at 1035

10  ("[C]ircuit courts have adopted a 'core functions' test, asking whether the defendant

11  is 'an integral part of a foreign state's political structure' or, by contrast, 'an entity

12  whose structure and function is predominantly commercial.'"); *accord Garb v.*

13  *Republic of Poland*, 440 F.3d 579, 593-94 (2d Cir. 2006) (same).

14          **2.      The National Commission does Not Qualify as an "Agency or**

15                  **Instrumentality" Because it is Not a "Separate Legal Person"**

16                  **Distinct from Argentina**

17          Applying this settled law, the National Commission is a "political

18  subdivision," not an "agency or instrumentality," because it does not qualify as a

19  "separate legal person" under the "core functions" test.

20          *First*, NML adequately pleads that the National Commission is a "political

21  subdivision" because it engages in predominantly governmental activity.   Argentina

22  is named as a party and the National Commission is specifically identified as a

23  "political subdivision" of Argentina throughout NML's Complaint.   Complaint, ¶¶

24  7, 19, 25, 36.   NML pleads that "political subdivisions are integral parts of the state

25  itself" and identifies the National Commission as an "Argentine political

26  subdivision."   Complaint, ¶ 7.   NML further pleads that the "core functions of [the

27  National Commission] are governmental" and therefore "it is a political subdivision

28  of Argentina and the Judgments are judgments not only against Argentina, but also

-7-

against [the National Commission]."  *Id.*, ¶ 19.   NML's allegations regarding the National Commission's governmental functions are not conclusory.   On the contrary, NML alleges that the National Commission was established to advance core sovereign interests including the "National Space Program," *id.*, ¶¶ 19-21, and the implementation of at least two treaties, *id.*, ¶ 22.   NML alleges that the National Commission "does not have financial independence and is funded annually by the Argentine National Congress," *id.*, ¶ 23, and is under the "direct control of the Argentine government," which appoints eight of the nine members of the National Commission's Board of Directors.   *Id.*, ¶ 24.

   *Second*, the National Commission's enabling legislation (the "Enabling Decree")—incorporated by reference in and attached to NML's Complaint— corroborates NML's allegations and confirms that the core functions the National Commission engages in are predominantly governmental.   *Id.*, ¶ 20; Exhibit C. The National Commission was created to consolidate the state's power and "*increase the participation* of the National Congress in the scheduling and control of national space policy," and to "*centralize*, organize, manage, and execute an overall space policy."   Exhibit C, Preamble (emphasis added).   The National Commission "report[s] directly and exclusively to the President of the Nation."   *Id.*, art. 1.   The "National Space Plan" executed by the National Commission, "as well as its financing mechanism," "must be approved by the NATIONAL EXECUTIVE BRANCH."   *Id.*, art 2.   Any "cooperation with public and private entities of other countries" is subject to "proper intervention by the MINISTRY OF FOREIGN RELATIONS AND RELIGION."   *Id.*, art. 3.   The eight "political members" of the board consists of the Minister and Secretary of Foreign Relations, International Trade, and Religion, in addition to six other representatives "appointed by the NATIONAL EXECUTIVE BRANCH" from seven different Ministries or Departments identified by name.   *Id.*, art. 5.   Any financial resources are "assigned to it in the national budget" subject to "parliamentary approval" that is "managed by

-8-

the executive branch." *Id.*, art. 6.   The National Commission's "properties and installations" are "administrative and technical offices" of the state, and other properties "allocated by the Armed Forces" and "MINISTRY OF DEFENSE."   *Id.*, art. 7.   Finally and importantly, the Enabling Decree does *not* establish the National Commission as an Argentine corporate entity, discuss its stock or other ownership structure, identify any predominant commercial functions, or otherwise identify any commercial activity that would provide the National Commission with financial independence.   *See id.*

   *Third*, the declarations of Conrado Varotto and Oleh Jachno, submitted by Argentina in support of its motion, establish that the National Commission engages in predominantly governmental activity.   The statements in those declarations confirm that the core functions of the National Commission are predominantly governmental rather than commercial.   Varotto explains that the National Commission "operates under the supervision of Ministry of Planning and Infrastructure."   Varotto Decl., ¶ 6.   Jachno confirms that the National Commission advances governmental interests through "promot[ing] and perform[ing] scientific research in the area of space technology and with the mission of developing Argentina's national space program," and that the Board of Directors is composed of political appointees who work in sister Argentine political subdivisions.   Jachno Decl., ¶ 4.   While Jachno claims in conclusory fashion that the National Commission has "functional independence" and "legal personality separate from the Republic," he does not identify any separate juridical entity or corporation, or ownership structure.   *Id.*, ¶3.   In any event, these assertions are irrelevant to whether the National Commission's core functions are predominantly governmental. Furthermore, Jancho's claims of "financial autarky"—whether interpreted to mean external or internal financial independence—are contradicted by the Enabling Decree, which explains that Argentina both funds the National Commission and approves its "budget items."   *Compare id.*, ¶ 3, *with* Exhibit C, art. 6.   Ultimately

-9-

1    these hollow claims of financial independence are irrelevant to whether the National

2    Commission is a "separate legal person" under the "core functions" test, however,

3    because Jachno identifies no predominant commercial functions of the National

4    Commission.

5         In sum, the National Commission is an integral part of Argentina's political

6    structure and does not engage in predominantly commercial activity.[5]   *Cubic*, 495

7    F.3d at 1035.   It is a "political subdivision" of Argentina because it is not a

8    "separate legal person" under § 1603(b)(1).   Because NML has presented

9    overwhelming evidence that the National Commission is a "political subdivision"

10   subject to jurisdiction in this action, the burden shifts to Argentina to prove the

11   contrary by a preponderance of the evidence.   *Siderman de Blake*, 965 F.2d at 707-

12   08.   This it cannot do.

13        **B.    The National Commission is Liable for the Judgments against**

14             **Argentina**

15        Because the National Commission is a "political subdivision" of Argentina

16   under the "core functions" test, it *is* the state for purposes of § 1610(a)(1) of the

17   FSIA.   As such, its "property . . . used for a commercial activity in the United

18   States, shall not be immune from attachment in aid of execution, or from execution,

19   upon a judgment entered by a court of the United States . . . if—the foreign state has

20   waived its immunity from attachment in aid of execution or from execution either

21   explicitly or by implication . . . ."   28 U.S.C. § 1610(a)(1).   NML pleads, and the

22

23        [5]   Argentina improperly devotes pages of analysis to *Spaceport*—a decision that
     did not address any of the disputed issues raised in *this case*.   *NML Capital, Ltd. v.*
24   *Spaceport Sys. Int'l, LP*, 788 F. Supp. 2d 1111 (C.D. Cal. 2011).   First, as
     Argentina admits, *Spaceport* did not address the legal issue of whether the National
25   Commission was an "agency or instrumentality," and instead assumed it was a
     "political subdivision" for purposes of its analysis.   Mot. 6 n.7.   Second, *Spaceport*
26   did not address the factual issue of whether the Launch Services Rights—in contrast
     to the satellite itself—constitutes property used for commercial activity in the
27   United States.

28

1   facts confirm, that Argentina broadly waived its immunity from suit and execution.

2   Complaint, ¶ 16; *EM Ltd. v. Republic of Argentina,* 473 F.3d 463, 480 n.18 (2d Cir.

3   2007) ("the Republic indisputably waived its assets' immunity from attachment").

4   The only remaining issue, discussed below, is whether the Launch Services Rights

5   qualify as property used for a commercial activity in the United States.[6]   28 U.S.C.

6   § 1610(a)(1).

7          The Supreme Court's decision in *Bancec*, which addresses when a separate

8   "agency or instrumentality" is liable for a judgment against a state, does not apply to

9   a governmental entity that is a mere "political subdivision" because it is an integral

10   part of the state itself.   Consequently, if the National Commission is found to be a

11   "political subdivision" under the "core functions" test, it *is* the state for purposes of

12   § 1610(a)(1), and the alter-ego test has no applicability.   *See Compagnie Noga*

13   *D'importation et D'exportation SA v. Russian Fed'n*, 361 F.3d 676, 685 (2d Cir.

14   2004) ("As the principal issue in this appeal is *whether* the Government is an

15   instrumentality established as a juridical entity distinct and independent from the

16   Russian Federation, the *Bancec* decision is of little help to us here.").

17          **C.     Argentina's "Agency or Instrumentality" Analysis is**

18                 **Fundamentally Flawed**

19          It is established law in the Ninth Circuit that the "core functions" test governs

20   whether an entity is a "separate legal person" under § 1603(b)(1).   *Cubic*, 495 F.3d

21   at 1035-36.   Because the predominant functions of the National Commission are so

22   clearly governmental, Argentina desperately attempts to avoid the "core functions"

23

24   _____

25      [6]   The fact that the National Commission's core functions are predominantly
     governmental does not mean its property in the United States may only be used for
26   governmental activities.   In fact, it is common for entities engaged in
     predominantly governmental functions to deploy their property in activities that are
27   commercial in nature.   This fact does not render the *core functions* of the National
     Commission any less governmental in nature.
28

-11-

1 test by making a variety of flawed and confusing arguments.   None of them are

2 tenable.

3       *First*, Argentina argues that the term "agency or instrumentality"—defined in

4 § 1603(b)—means one thing in § 1610 (addressing execution), but another thing in

5 §§ 1605, 1606, and 1608 (addressing immunity, extent of liability, and service).

6 Mot. 15.   That is not the law.   *Garb* specifically relied on a case that diminished

7 the protections of a foreign entity.   *See* 440 F.3d at 592 (citing *Noga*, 361 F.3d at

8 688) (applying the "core functions" test and holding that an arbitration award

9 against the Government of Russia was enforceable against the Russian Federation).

10 In addition to ignoring the basic principle that "identical words and phrases within

11 the same statute should normally be given the same meaning," *Powerex Corp. v.*

12 *Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007), the Second Circuit

13 specifically referenced § 1610 when discussing the "core functions" test in *Garb*—

14 noting that the critical term, "agency or instrumentality," "pervades the FSIA."   440

15 F.3d at 590 & n.10.   This reference would make no sense if this pervasive term had

16 shifting meanings throughout the Act.

17       *Second*, Argentina argues that the "core functions" test has "no application to

18 the question of whether an 'agency or instrumentality' is substantively liable for the

19 state's debts," which is governed by *Bancec*'s alter-ego test.   Mot. 15-16.   But that

20 simply begs the threshold question of whether the National Commission is a

21 separate "agency or instrumentality" to begin with.   If it is not—because it is an

22 integral part of the state that engages in predominantly governmental functions—

23 then *Bancec*'s alter-ego test is inapplicable because there is no veil to pierce via an

24 alter-ego analysis.   A political subdivision and the state are one and the same, and

25 the political subdivision is necessarily liable for any judgment against the state.

26 Argentina argues the Supreme Court in *Bancec* expressly declined to adopt the "core

27 functions" test "in the context of assigning liability," but it only did so in connection

28 with assigning liability to an indisputedly separate commercial entity—a Cuban

-12-

1  bank—that otherwise satisfied the FSIA's standard for an "agency or

2  instrumentality."   462 U.S. at 633 n.27.   *Bancec* did not disapprove of established

3  law in this circuit and others that the "core functions" test controls whether an entity

4  is an "agency or instrumentality" in the first instance.[7]

5        *Third*, Argentina argues that the "core functions" test is limited to "ministries,

6  treasuries, or other government departments," Mot. 16, that any other governmental

7  entity not falling under those categories is presumptively "separate," and that the

8  court need not apply the "core functions" test here.   Argentina is wrong.   The

9  Second Circuit has warned that "the very purpose of the 'core functions' test is *to*

10  *look beyond mere labels* to discern whether an entity is actually engaged in

11  predominantly governmental activity or whether its primary functions are instead

12  commercial."   *Garb*, 440 F.3d at 597 n. 22 (emphasis added).   Argentina's citation

13  to *European Cmty. v. RJR Nabisco, Inc.*, --- F.3d ----, 2014 WL 1613878 (2d Cir.

14  Apr. 29, 2014), does not undermine this analysis.   That case explained that the

15  status of the European Community (the predecessor of the European Union) as a

16  "separate legal person" from its member states under § 1603(b)(1) was undisputed;

---

17        [7]   Insofar as Argentina relies on the "organ" test to contend that the National

18  Commission is an "agency or instrumentality," Argentina's reliance is misplaced.

19  *See* Mot. 13 n.14.   The "organ" test determines when *commercial* entities that are

   *distinct* from the state under the "core functions" test nonetheless qualify as state

20  "agencies" or "instrumentalities" that are entitled to immunity under the FSIA.

   *See, e.g.*, *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir.

21  2008) (holding that a commercial "Canadian corporation that markets and

22  distributes electric power" was an "organ" of the province of British Columbia).

   The "core functions" test determines whether an entity is a "separate legal person"

23  under § 1603(b)(1), and the "organ" test determines whether a "separate legal

24  person" is an "organ of a foreign state or political subdivision" under § 1603(b)(2).

   Here, the dispute does not turn on whether a commercial entity that is acknowledged

25  to be a "separate legal person" qualifies for immunity nonetheless—the dispute

26  turns on whether the National Commission is a "separate legal person" in the first

27  instance.   Because NML has sufficiently pleaded that the National Commission is

   not a "separate legal person," both the "organ" test and *Bancec* alter-ego test are

28  inapplicable to this case.

---

-13-

the only issue was whether this "agency or instrumentality" was an "organ" under § 1603(b)(2) that engaged in public activity on behalf of its member states and could invoke federal jurisdiction. *Id.* at \*10-11. Here, in contrast, there is no *sui generis* supra-national entity, and the National Commission's status as a "separate legal person" from Argentina is the issue.

*Finally*, Argentina argues that *Bancec*'s description in dicta of a "typical government instrumentality, if one can be said to exist," somehow displaces *later* authority in this circuit adopting the "core functions" test. Mot. 15; *Bancec*, 462 U.S. at 624; *see also Spaceport*, 788 F.3d at 118 (discussing *Bancec* in dicta). But to the extent those factors are relevant, they likewise support the conclusion that the National Commission is not an "agency or instrumentality." Argentina has presented no evidence that the National Commission is a separately constituted legal entity with a discernable corporate or ownership structure, no evidence that it is free from oversight of its "budgetary and personnel requirements," and most importantly, no evidence the National Commission is "primarily responsible for its own finances" and "run as a distinct *economic* enterprise." *Bancec*, 462 U.S. at 624 (emphasis added); *see also Aurelieus Capital Partners, LP v. Republic of Argentina*, 2009 WL 755231, at \*11 (S.D.N.Y. March 12, 2009), *vacated on other grounds*, 584 F.3d 120 (2d Cir. 2009) (applying the "core functions" test and holding that the Argentine Social Security Administration ("ANSES") was a "political subdivision" of Argentina); *EM Ltd. v. Republic of Argentina*, 2009 WL 3149601, at \*6 (S.D.N.Y. Sept. 30, 2009), *vacated in part on reconsideration*, 2010 WL 3910604 (S.D.N.Y. Sept. 30, 2010), *aff'd sub nom. NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254 (2d Cir. 2012) (Argentina did not dispute that *Agencia Nacional de Promocion Cientifica y Tecnologica* ("ANPCT")—a division of the Argentina's Ministry of Science, Technology that "administers a program that issues grants for scientific research"—was a "political subdivision"). Because the National Commission is a "political subdivision" of Argentina, it is liable for the

1  Judgments without regard to *Bancec*'s alter-ego test governing "agencies or

2  instrumentalities."

3  **II.     The Launch Services Rights Are Subject To Execution Under The FSIA**

4         Argentina separately argues that NML cannot attach the Launch Services

5  Rights because those rights are not being used for a commercial activity in the

6  United States, as required by § 1610(a) of the FSIA.   This argument is meritless.

7  In order to survive dismissal under Rule 12(b)(6), the Complaint need not contain

8  "detailed factual allegations," but must only "raise a right to relief above the

9  speculative level on the assumption that all of the complaint's allegations are true."

10  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).   That standard is surely

11  satisfied here.   SpaceX's launch services are commercial services used by private

12  and governmental entities alike.   *See* Complaint, ¶ 32.   The National

13  Commission's maintenance of the right to use SpaceX's launch services is thus a

14  "commercial activity" and the Launch Services Rights are thus available for

15  execution under the FSIA.   Argentina's motion to dismiss must be denied.

16         **A.     Argentina is Using its Contractual Rights Under the Launch**

17              **Services Contracts for a Commercial Activity in the United States**

18         A foreign state's property is subject to execution under the FSIA if it is "used

19  for a commercial activity in the United States."   28 U.S.C. § 1610(a).[8]   Section

20  1603(d) of the Act defines commercial activity:

21         A "commercial activity" means either a regular course of commercial

22         conduct or a particular commercial transaction or act.   The commercial

23         character of an activity shall be determined by reference to the nature

24         of the course of conduct or particular transaction or act, rather than by

25         reference to its purpose.

26  _____

27  [8]   If the National Commission were an "agency or instrumentality," which it is
    not, then its property could be subject to execution under the more lenient standard

28  of § 1610(b) of the Act.

1   28 U.S.C. § 1603(d).

2       As the Supreme Court explained in *Weltover*, "the question [regarding

3   commercial activity] is not whether the foreign government is acting . . . with the

4   aim of fulfilling uniquely sovereign objectives," but instead, the appropriate inquiry

5   is "whether the government's particular actions . . . are the type of actions by which

6   a private party engages in commerce."  504 U.S. at 164; *see also* H.R. REP. 94-

7   1487, 16, 1976 U.S.C.C.A.N. 6604, 6615 (noting that "commercial activity" is

8   defined broadly, and that "if an activity is customarily carried on for profit, its

9   commercial nature [can] readily be assumed").  Thus, when examining the foreign

10  state's use of its property, a court should "carefully focus on the specific conduct at

11  issue."  *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574,

12  580 (7th Cir. 1989).  For example, if a foreign state contracts to purchase bullets for

13  its military, this is a commercial activity "because private companies can similarly

14  use sales contracts to acquire goods."  *Weltover*, 504 U.S. at 614-15.  And, as

15  stated above, the foreign state's purpose in engaging in the commercial activity is

16  irrelevant to whether the activity is commercial or not—all that matters is the nature

17  of the activity in question and whether it is the type of activity that private parties

18  engage in when engaging in commerce.  *See id.* at 607 ("[B]ecause the [FSIA]

19  provides that the commercial nature of an act is determined by reference to its

20  'nature' rather that its 'purpose' . . . the issue is whether the particular actions that

21  the foreign state performs (*whatever the motive behind them*) are the type of actions

22  by which a private part engage in trade.") (emphasis added).

23      Under these legal standards, NML's Complaint alleges facts sufficient to meet

24  these requirements.  *See, e.g.*, Complaint, ¶¶ 27-34.  It identifies the property of

25  Argentina that it seeks to execute on, namely the Launch Services Rights.  It further

26  alleges that these Rights include the right to two Falcon 9 launches from SpaceX's

27  launch facility at Vandenberg Air Force Base in 2015 and 2016.  It then alleges that

28  Argentina is using these property rights "for" a commercial activity, namely, to

-16-

1   launch satellites.   And it indicates that Argentina is currently using these same

2   rights to maintain its launch position.   Indeed, in its moving papers, Argentina

3   affirmatively asserts that it is using the Launch Services Rights to launch two

4   satellites.   Varotto Decl., ¶ 4.

5        Launching a satellite is clearly a commercial activity within the meaning of

6   the FSIA and *Weltover*—commercial companies do it regularly in the course of their

7   commercial activities.   Indeed, as set forth in the Complaint, SpaceX is a private

8   company in the business of launching satellites, for a profit, and over 60% of

9   SpaceX's launch services customers are commercial customers.   Complaint, ¶ 32.

10  As a result, the Complaint properly alleges that Argentina is using the Launch

11  Services Rights for a commercial activity in the United States.

12       In sum, NML has pled more than enough facts to meet the requirements of 28

13  U.S.C. § 1610(a) with respect to the use of the Launch Services Rights for a

14  commercial activity in the United States.

15       **B.    Argentina's Arguments that It is Not Using the Launch Rights for**

16            **a Commercial Activity are Baseless**

17       NML has alleged facts sufficient to meet the requirements of § 1610(a) of the

18  FSIA.   Rather than address the sufficiency of NML's allegations head on, however,

19  Argentina seeks to deflect from them by misstating the applicable law,

20  mischaracterizing the assets being levied on and distorting the relationship of those

21  assets to Argentina's commercial activities.

22       *First*, Argentina asserts that NML is misapplying *Weltover* with respect to the

23  meaning of the phrase "commercial activity."   According to Argentina, the term

24  "commercial activity" has a different meaning when used in different sections of the

25  FSIA, and the usage of the term reflected in *Weltover* applies only to § 1605, and

26  not to § 1610.   Mot. 19 n. 17.   According to Argentina, the meaning of the term

27  "commercial activity" as used in § 1610 is somehow narrower than its meaning "in

28  the context of Section 1605(a)(2)."   *See id.*   This argument is incorrect and runs

-17-

1  afoul of one of the basic tenets of statutory construction:   A term used multiple

2  times in a statute should be given the same meaning throughout.   *See, e.g.,*

3  *Powerex*, 551 U.S. at 232.   Moreover, this same argument has been soundly

4  rejected by various courts.   *See, e.g., NML Capital, Ltd. v. Republic of Argentina*,

5  680 F.3d 254, 258 (2d Cir. 2012) (adopting *Weltover*'s definition of "commercial

6  activity" in its § 1610 analysis).

7          *Second*, citing *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080

8  (9th Cir. 2007), Argentina asserts that the Launch Services Rights are not being

9  "used for" a commercial activity, as set forth in § 1610 of the FSIA.   Mot. 18.

10  Argentina is incorrect.   *Af-Cap* held that the term "used for," as used in § 1610,

11  means that the state's property "is put into action, put into service, availed or

12  employed *for* a commercial activity . . . ."   475 F.3d at 1087-91 (citing *Conn. Bank*

13  *of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002)).   The Launch

14  Services Rights meet this standard, as the Complaint alleges that the Launch

15  Services Rights are being used by Argentina to secure its ability to launch a satellite

16  using SpaceX's rockets and launch operations in the United States.   SpaceX

17  frequently contracts with private parties to perform these services, and Argentina

18  cannot argue that its sovereign status changes the nature of the services it has

19  purchased from SpaceX.

20          Argentina also argues that the property at issue must be in "active

21  employment" at the time execution is sought.   Mot. 18.   In support of this dubious

22  proposition, it cites *Aurelius Capital Partners, LP v. Republic of Argentina*, 584

23  F.3d 120, 130 (2d Cir. 2009), which dealt with a writ of attachment on funds in a

24  bank account.   Because the order attaching the funds of Argentina's Social Security

25  Administration was served before the funds in question had been transferred to the

26  Administration, "neither the Administration nor the Republic had the opportunity to

27  use the funds for any commercial activity whatsoever at the time of the attachment."

28  *Id.* at 131.   Not so in the present case, as the National Commission owns the

-18-

1   Launch Services Rights and is presently employing them to secure its position to

2   launch its satellites.[9]

3        In a related vein, Argentina cites *Connecticut Bank of Commerce v. Republic*

4   *of Congo*, 309 F.3d 240, 254 (5th Cir. 2002), to argue that NML cannot attach the

5   Launch Services Rights because those rights were "received" by Argentina as a

6   result of a commercial transaction with SpaceX and, as a result, are not being "used"

7   by Argentina for a commercial transaction.   Mot. 19-20.   Argentina is wrong.   The

8   Complaint alleges that the Launch Services Rights are being used for a commercial

9   activity:   launching satellites from Vandenberg Air Force Base and maintaining

10  Argentina's launch slots for those launches up through the time of launch.   By

11  suggesting that it is not using the launch rights to launch a satellite, Argentina

12  distorts the record and the allegations of the Complaint—and ignores reality.

13       *Third*, Argentina asserts that, because it intends to use its satellites for

14  governmental purposes, "any 'use' by [the National Commission] of the underlying

15  Launch Services Rights to launch them could not be commercial either."   Mot. 21;

16  Varotto Decl., ¶ 1.   But this is sheer sophistry based on false assumptions.   The

17  assets at issue are the Launch Services Rights, not the satellites that Argentina now

18  claims it would launch using them.   And those Launch Services Rights are being

19  used for a commercial activity, namely, to launch a satellite, and to maintain those

20  rights to launch a satellite up to the time of launch.[10]   Argentina's purposes for

21

22      [9]   In support of its "affirmative use" or "active use" test that it conjured up for
23  the purpose of this motion, Argentina cites *Cubic*.   In *Cubic*, the court held that a
    judgment creditor could not attach a $2.8 million judgment that had been awarded to
24  Iran because "Iran intend[ed] to send the proceeds back to Iran for assimilation into
    [its agency's] general budget."   495 F.3d at 1037.   This is inapposite to the present
25  case, as the National Commission is not selling its Launch Contract Rights and
26  sending the proceeds back to Argentina to be put in its general budget.   Instead, the
    National Commission is employing its Launch Service Rights to launch its satellites.
27  [10]   Whereas cash or other types of fungible property may have many uses,
28  when, as here, the property at issue is comprised of contractual rights for a specific

1   launching such a satellite are irrelevant to the analysis of whether the Launch

2   Services Rights is property being used for a commercial activity.   Indeed, that is

3   precisely the teaching of *Weltover*.[11]

4          In sum, NML has sufficiently alleged that the property it seeks to execute on,

5   namely, the Launch Services Rights, is property being used for a commercial

6   activity in the United States.   Accordingly, Argentina's motion to dismiss on this

7   basis must be denied.

8   **III.   Argentina Has Waived Its Objections To Service Of Process Under Rule**

9   **12(b)(5)**

10         Argentina attempts to "reserve[] the right to invoke the FSIA's service

11  provisions in the future" in a footnote to its motion to dismiss.   Mot. 8 n.8.   Its

12  effort fails:   Argentina has waived its objection to service of process under Rule

13  12(b)(5) by failing to brief the issue sufficiently in its initial motion under Rules

14  12(b)(1) and 12(b)(6).   *See Schnabel v. Lui*, 302 F.3d 1023, 1033 (9th Cir. 2002)

15  ("Under Rule 12(h)(1), Froyer USA has waived any defense of lack of personal

16

17  endeavor (*e.g.*, holding launch slots and launching satellites, and all other
    preparatory steps), it follows that this property is used for this commercial

18  activity.   As a result, the Launch Service Rights in this case are used for a particular
    commercial activity in the United States, unlike the property in the other cases cited

19  by Argentina, where either the property was not limited to any particular use, *see
    Aurelieus*, 584 F.3d at 131, or the use was not for a commercial activity in the

20  United States.   *See Cubic*, 495 F.3d at 1037.

21         [11]   In support of its assertion that the National Commission's use of its Launch

22  Service Rights is not commercial in nature, Argentina cites *Brant Point, Ltd. v. The
    Republic of Congo*, an unpublished Westchester County Supreme Court decision.

23  Mot. 20-21; *Brant Point, Ltd. v. Republic of Congo*, Index No. 4238/04 (Sup. Ct.

24  Westchester Cnty. Dec. 12, 2006) (Brown Decl., Ex. A).   Not only is this an
    unpublished state court decision that has no precedential value, but the *Brant Point*

25  court made no reference to *Weltover*'s "commercial activity" definition, which was

26  subsequently adopted by the Second Circuit.   Based on this court's scant analysis, it
    appears to have misapplied the principles set forth in *Weltover*, in that it focused on

27  the purpose of the embassy building being repaired, instead of the clearly

28  commercial nature of renovating a building.

1  jurisdiction, insufficiency of process, or insufficiency of service of process, by
2  failing to raise the defense in its first motion under Rule 12(b).”); *Rector v. Scott*,
3  2014 WL 580158, at *2 (C.D. Cal. Feb. 11, 2014) (“a motion to dismiss for
4  insufficient service/process must be filed before an answer”); *Quach v. Cross*, 2004
5  WL 2862285, at *2 (C.D. Cal. Dec. 3, 2004) (“[B]y failing to assert inadequate
6  service of process in his 12(b)(6), Defendant Taylor waived his right to have the
7  complaint dismissed against him based solely on the alleged deficiency in service.”).
8  If a party waives an argument by only raising it in a footnote, then it certainly
9  waives an argument by purporting to “reserve” it “in the future” through a footnote.
10 *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010).   This
11 maneuver is a transparent end-run around the limitations of Rule 12(h)(1).   In
12 *Capital Ventures International v. Republic of Argentina*, 2010 WL 1257611, at *3
13 (S.D.N.Y. March 31, 2010), the court similarly held that Argentina had waived any
14 Rule 12(b)(5) objection by failing to raise it in its previous motion based on Rules
15 12(b)(1) and (6).   If Argentina elects to raise its waived service-of-process
16 argument, this Court should not consider it.

17                                  **<u>CONCLUSION</u>**

18      Argentina’s motion to dismiss should be denied.   The National Commission
19 is a “political subdivision” of Argentina that is liable for the Judgments, and the
20 Launch Services Rights at issue qualify as property used for “commercial activity”
21 in the United States.   In the strict alternative, to the extent the Court finds that
22 Argentina’s motion to dismiss under Rule 12(b)(1) raises disputed factual issues
23 implicating the Court’s jurisdiction, the Court should deny the motion to dismiss
24 without prejudice and allow NML to take discovery regarding whether the National
25 Commission is a “political subdivision” under the “core functions” test, or
26 alternatively whether it is the alter-ego of Argentina.

27
28

1  DATED:   June 5, 2014

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  Harold A. Barza
  Bruce E. Van Dalsem
  Ian S. Shelton
  Matthew S. Hosen


By _____
    Harold A. Barza

DECHERT LLP
  Robert A. Cohen (of counsel)
  robert.cohen@dechert.com
1095 Avenue of the Americas
New York, NY 10036
Telephone:   (212) 698-3500
Facsimile:    (212) 698-3599

Attorneys for Plaintiff NML Capital, Ltd.

-22-