FILED
CLERK, U.S. DISTRICT COURT

Mar 6, 2015

CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_PMC\_\_\_\_ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NML CAPITAL, LTD., <br><br> Plaintiff, <br><br> v. <br><br> SPACE EXPLORATION TECHNOLOGIES CORP., et al. <br><br> Defendants. | Case No. CV 14-02262 SVW <br><br> ORDER GRANTING DEFENDANTS' MOTION TO DISMISS <br><br> AMENDED AND CORRECTED |

A New York hedge fund operating through the Cayman Islands snatched up billions of dollars in Argentinian bond debt. The country defaulted and eludes recompensation. So the hedge fund now seeks to satisfy the debt by levying the rights to launch two Argentinian satellites that are part of a planned intergovernmental mission to study the global environment. Argentina, its space agency, and the corporation that contracted to launch the satellites move to thwart this seizure before it gets off the ground.

I.  **Factual Allegations**

   A.  **Creation of CONAE**

In 1991, Argentina replaced its old national space agency with the *Comisión Nacional de Actividades Espaciales* (CONAE, for short). (Compl. ¶ 20, Ex. C, ECF No. 1). The enabling act proclaims CONAE a "National Government agency" with "full management and financial

independence." (Compl., Ex. C). And the Argentinian president vested CONAE with exclusive authority to "centralize, organize, manage, and execute an overall space policy" as well as the power to "[p]erform all the legal acts necessary for its normal operation," including "sign[ing] the contracts necessary for the achievement of its goals." (Compl., Ex. C). As a result, CONAE conducts research, develops national projects, trains personnel, appoints and removes employees, creates its own internal regulations and structure, arranges for the international exchange of space technologies, enters into agreements with foreign and domestic entities, implements treaties, provides technical assistance to the national government, generates its own funding, and promotes international cooperation. (Compl., ¶¶ 20-24, Ex. C).

Still, CONAE's board of directors is composed mostly of governmental bureaucrats, and it reports "directly and exclusively" to Argentina's president, who must approve the National Space Plan as well as its financing mechanism. (Compl., ¶ 24, Ex. C; Jachno Decl. ¶ 4, ECF No. 18-6).[1] And although CONAE claims to be an "autarkic independent entity," (Varotto Decl., ¶ 6, ECF No. 18-4; Jachno Decl., ¶ 3), it relies on appropriations from Argentina's legislature and must prepare an annual budget subject to parliamentary approval. (Compl., ¶ 23, Ex. C). Moreover, CONAE's international endeavors must conform with Argentina's foreign policy objectives, and the Ministry of Foreign Relations and Religion may intervene in any attempted international cooperation. (Compl., Ex. C).

### B. Bond Crisis & NML's Acquisitions

In late 2001, Argentina found itself in the throes of a severe financial crisis. J.F. Hornbeck, Cong. Research Serv., R41029, *Argentina's Defaulted Sovereign Debt: Dealing with the "Holdouts"* 1-2 (2013).[2] Faced with unsustainable indebtedness, the country defaulted on

---

[1] The Court considers the declarations as they apply to the jurisdictional arguments. *See Sachs v. Republic of Austria*, 737 F.3d 584, 589 (9th Cir. 2013) (en banc), *cert. granted sub nom. OBB Personenverkehr AG v. Sachs*, No. 13-1067, 2015 WL 292554 (U.S. Jan. 23, 2015). The Court, of course, limits its focus to the pleadings and incorporated documents when evaluating the motion to dismiss. *E.g.*, *Cooper v. Pickett*, 137 F.3d 616, 622-23 (9th Cir. 1996).

[2] The Court judicially notices certain materials to provide context for the facts of this case. Argentina's national default is a well-known global event, so general facts concerning its bond-debt crisis are suitable for judicial notice. Fed. R. Evid. 201. Even so, these facts

December 26, 2001. *Id.* at 2-3. At the time, it owed $81.8 billion to private investors. *Id.* at 3.

Argentina had long ago waived its sovereign immunity in connection with its bonds. (Compl., ¶ 16). So it began its debt restructuring process in 2002. Hornbeck, *supra*, at 5. But years of negotiations proved largely unfruitful. *Id.* In 2005, the country filed a unilateral offer with the SEC to settle with private creditors. Securities and Exchange Commission, Reg. No. 333-117111, 2005 Prospectus (2005). This offer resulted in a partial settlement: Argentina exchanged $35.2 billion of new bonds for $62.3 billion of debt. Hornbeck, *supra*, at 5.

Argentina created a new bond exchange five years later. Securities and Exchange Commission, Reg. No. 333-163784, 2010 Prospectus (2010). As a result, it settled about two-thirds of its remaining debt. Hornbeck, *supra*, at 7.

At some point during this bond crisis, NML Capital — a Cayman Islands LLC managed by a New York hedge fund — acquired some of this bond debt. (Compl., ¶¶ 1, 5). Evidently, NML Capital elected not to settle with Argentina. (*See* Compl., ¶1-3, 11-14). It instead sought and acquired final judgments against the state, which totaled (as relevant here) nearly $1 billion as of March 2014. (Compl. ¶¶ 11-14, Exs. A-B).

### C. CONAE Contracts with Space-X, and NML Seeks to Collect

CONAE is part of an international space mission to study the global environment. (Varotto Decl., ¶¶ 4-5). Over the next two years, CONAE intends to launch two observation satellites that will generate scientific data on a variety of climatological and environmental phenomena. (Compl., ¶ 30; Varotto Decl., ¶ 4). CONAE, in partnership with Italy's *Agenzia Spaziale Italiana*, will then distribute the data to the public. (Varotto Decl., ¶ 4).

To do so, CONAE contracted with Space Exploration Technologies, popularly known as SpaceX, for the latter to launch the former's satellites. (Compl., ¶ 30). SpaceX plans to send CONAE's satellites into orbit aboard two Falcon 9 rockets launched from Vandenberg Air Force Base, which is located on California's coast. (Compl., ¶ 30, Ex. D).

These contracts form the basis of NML's lawsuit. (Compl., ¶¶ 3-4). NML contends that

---

merely provide context — they do not underpin the Court's resolution of the merits.

3

"Argentina's rights in the Launch Services Contracts are property owned by CONAE within this District and subject to a creditor's suit," therefore, it adds, "NML is entitled to an order applying the Property, including the Launch Services Contracts, to the satisfaction of NML's judgments." (Compl. ¶¶ 37-38).

**II.     Legal Standard**

**A.     Federal Rule of Civil Procedure 12(b)(1)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction to hear the claims alleged. Fed. R. Civ. P. 12(b)(1). To the extent CONAE brings a factual challenge, the Court may review extrinsic evidence, and if the evidence is disputed, the Court may weigh the evidence and determine the facts to satisfy itself as to its power to hear the case. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

**B.     Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. *See* Fed. R. Civ. Proc. 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.*; *see also Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

In reviewing a Rule 12(b)(6) motion, the Court must accept all allegations of material fact as true and construe the allegations in the light most favorable to the nonmoving party. *Daniel v. County of Santa Barbara*, 288 F.3d 375, 380 (9th Cir. 2002). Thus, "[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their

4

veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

### III. Discussion

Foreign sovereign immunity has deep historical roots that predate this country's inception. Peter J. Smith, *States as Nations: Dignity in Cross-Doctrinal Perspective*, 89 Va. L. Rev. 1, 30-31, 36-37 (2003); *see also, e.g.*, *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812). In early American history, the executive branch controlled immunity determinations, and it unfailingly sheltered friendly foreign sovereigns from liability. *Semantar v. Yousuf*, 560 U.S. 305, 311 (2010); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); *Sachs v. Republic of Austria*, 737 F.3d 584, 589 & n.2 (9th Cir. 2013) (en banc), *cert. granted sub nom. OBB Personenverkehr AG v. Sachs*, No. 13-1067, 2015 WL 292554 (U.S. Jan. 23, 2015). The twentieth century oversaw a philosophical shift: the State Department advocated, in principle, for the "restrictive theory" of foreign sovereign immunity whereby states only enjoyed immunity for *jure imperii* — the public acts of state. *Sachs*, 737 F.3d at 590; *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1126 (9th Cir. 2010). In practice, however, diplomatic considerations made immunity determinations imprecise, and courts struggled to cope with the resulting inconstancy. *See Verlinden*, 461 U.S. at 486-88. "Congress abated the bedlam in 1976, replacing the old executive-driven, factor-intensive, loosely common-law-based immunity regime with the Foreign Sovereign Immunities Act's 'comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.'" *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014) ("*NML III*") (quoting *Verlinden*, 461 U.S. at 488).

The FSIA governs all aspects of foreign sovereign immunity, *see NML III*, 134 S. Ct. at 2255-56, and, consequently, provides the analytical bedrock for this case. It furnishes "two primary forms of immunity." *NML Capital, Ltd. v. Spaceport Systems Intern., L.P.*, 788 F. Supp. 2d 1111, 1119 (C.D. Cal. 2011) ("*Spaceport*") (quoting *Rubin v. Islamic Republic of Iran*, 637 F.3d 782, 793 (7th Cir. 2011)). Section 1604 grants foreign states general jurisdictional immunity. 28 U.S.C. § 1604; *see also Sachs*, 737 F.3d at 590. Section 1609 protects a foreign state's property that resides within the United States. 28 U.S.C. § 1609. These immunities are

extensive, but, in consonance with the restrictive theory of foreign sovereign immunity, they are not unwavering. *See* 28 U.S.C. §§ 1605, 1607, 1609-10. And this case turns on whether the Act's exceptions to these immunities apply. The Court conducts this analysis, as it must, with due caution and respect for the property of foreign nations. *See Peterson*, 627 F.3d at 1128.

**A.     Jurisdictional Immunity**

As a sovereign nation, Argentina wears the armor of presumptive immunity. 28 U.S.C. § 1604. But that prerogative carries with it the inverse power of waiver. 28 U.S.C. § 1605(a). Argentina elected to do so, relinquishing its immunity in a 1994 agreement governing its bonds. The question is whether Argentina's abdication of jurisdictional immunity extends to CONAE. That question, in turn, hinges on the proper characterization of CONAE's relationship with its sovereign. If, on the one hand, CONAE is an agency or instrumentality, it is an independent juridical entity with its own jurisdictional immunity. *See Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systs.*, 495 F.3d 1024, 1035 (9th Cir. 2007), *rev'd sub nom. on other grounds Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009). If, on the other hand, CONAE is a political subdivision, Argentina's waiver speaks for both entities. *See id.*[3]

1.     Applicable Rule

As a threshold matter, the parties dispute the applicable analytical framework. NML submits that the Court should apply the core functions test adopted in *Cubic*, 495 F.3d at 1035. CONAE disagrees, arguing that the governing authority is *First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611 (1983).

The ultimate jurisdictional question is whether CONAE is an agency or instrumentality entitled to its own jurisdictional immunity or a political subdivision that is indivisible from its parent state. The core functions test answers that question: according to the Ninth Circuit, "the 'core functions' test [is] the appropriate benchmark for deciding whether an entity should be

---

[3]     The applicable statute actually has a three-pronged definition for "agency or instrumentality." 28 U.S.C. § 1603(b). The parties do not argue two parts of that definition — only the "separate legal person" prong remains in dispute. *See id.*

6

viewed as a 'foreign state' or as an 'agency or instrumentality.'" *Cubic*, 495 F.3d at 1035. Indeed, *Cubic* involved an indistinguishable posture. There, like here, the plaintiff sought and acquired a judgment in a separate action against the foreign state and its agency. *Id.* at 1027-28. And there, as here, the case concerned the plaintiff's attempt to collect the judgment by attaching a contract between an American company and the state agency. *Id.* at 1028-29.[4] The Ninth Circuit used the core functions test to determine whether the defendant state agency was a separate entity under the FSIA. *Id.* at 1034-35. And the Court here will do the same.

Other courts have reached the same conclusion. *See Wye Oak Tech., Inc. v. Rep. of Iraq*, 666 F.3d 205, 214-15 (4th Cir. 2011) (observing that courts deploy the core functions test "[t]o determine whether an entity is an agency or instrumentality — and thus legally separate from the foreign state — or a mere political subdivision" in a variety of circumstances under FSIA); *cf. Garb v. Republic of Poland*, 440 F.3d 579, 590-98 (2d Cir. 2006) (applying the core functions test to determine whether Poland's Ministry of the Treasury was a separate entity for purposes of FSIA's takings exception); *Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 234-35 (D.C. Cir. 2003) (applying the core functions test to decide whether Iran's Ministry of Foreign Affairs was part of the state itself or an agency or instrumentality for purposes of FSIA's terrorism exception); *Magness v. Russian Federation*, 247 F.3d 609, 613-16 & n.7 (5th Cir. 2001) (applying the core functions test to determine the status of two state entities); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149-50 (D.C. Cir. 1994) (applying the core functions test to determine the juridical status of Bolivia's Air Force in order to apply the correct service provisions under FSIA); *NXP Semiconductors USA, Inc. v. Brevets*, No. C 14-1225 SI, 2014 WL 4621017, at *8 (N.D. Cal. Sept. 15, 2014); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 73 (D.D.C. 2011); *NML Capital, Ltd. v. Republic of Argentina*, No. 03 Civ. 8845(TPG), et al., 2011 WL 1533072, at *5 (S.D.N.Y. Apr. 22, 2011) ("*NML I*").

*Bancec*, in contrast, concerns a different problem. It governs whether a distinct juridical entity of a foreign state can be held liable, as a matter of substantive liability law, for the debts of

---

[4] In *Cubic*, the contract was actually between an American company and the relevant state agency's predecessor in interest. 495 F.3d at 1028. This distinction is immaterial here.

7

the state itself. *Bancec*, 462 U.S. at 624-28. That analysis, however, presupposes the answer to the question the Court faces: whether CONAE *is* a distinct juridical entity. *See id.* at 613, 624-28, 633-34. Thus, *Bancec* is largely inapposite at this stage. *See Wye Oak Technologies*, 666 F.3d at 215 n.13 (observing that *Bancec* does not apply to "the question of jurisdiction under the FSIA, to which the core functions test is aimed"); *Servaas Inc. v. Rep. of Iraq*, No. 10-828-CV, 2011 WL 454501, at *2 (2d Cir. Feb. 10, 2011) (slip op.) (unpublished) (concluding that the core functions test, not *Bancec*, determines whether an entity is a separate juridical entity), *as amended* (Feb. 16, 2011).[5]

### 2. Application

The core functions test is categorical. *Roeder*, 333 F.3d at 234. If an entity's core functions are predominantly governmental, then it is a political subdivision. *E.g.*, *id.* If the entity's core functions are predominantly commercial, then it is an agency or instrumentality. *E.g.*, *id.*

The ends of the spectrum are well-defined. For example, armed forces or military intelligence services are political subdivisions. *Wye Oak Tech.*, 666 F.3d at 214-15; *Cubic*, 495 F.3d at 1034; *Roeder*, 333 F.3d at 234; *Transaero*, 30 F.3d at 151; *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 70 (D.D.C. 2011); *Baker*, 775 F. Supp. 2d at 73; *Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 32-33 (D.D.C. 2010); *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 199 (D.D.C. 2008); *Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46,

---

[5] Defendants express concern that the Court's application of the core functions test will determine substantive liability. The Fourth Circuit's analysis in *Wye Oak Technologies* allays this fear:
> At the outset, we note that [Defendant's] concern that our decision will affect its ultimate liability is misplaced. Determinations under FSIA go only to jurisdiction, and [Defendant] will be free to challenge its liability later in the case. In other words, what we are concerned with here is not [Plaintiff's] argument that [Defendant] is liable on the contract but rather whether [Plaintiff] is entitled to the opportunity to make such an argument at all.

666 F.3d at 213 n.9. Defendants here, unlike in *Wye Oak Technologies*, also moved under Rule 12(b)(6). But that difference does not mean that the Court should apply *Bancec* to the subject matter jurisdiction inquiry, which must be addressed before any substantive questions. *See Ruhgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578-88 (1999).

54 (D.D.C. 2008). Likewise, consular organizations operating embassies are political subdivisions. *Lee v. Taipei Econ. & Cultural Representative Office*, No. 4:09-CV-0024, 2010 WL 2710661, at *3 (S.D. Tex. July 6, 2010); *Segni v. Commercial Office of Spain*, 650 F. Supp. 1040, 1041-42 (N.D. Ill. 1986). The same goes for government ministries. *Servaas, Inc.*, 2011 WL 454501, at *3; *Garb*, 440 F.3d at 594; *Magness*, 247 F.3d 6 at 613 n.7. And it is easy to see why: waging war, engaging in foreign diplomacy, and conducting the affairs of state are quintessential government functions.

In contrast, the core functions of entities acting as private companies are predominantly commercial. For instance, a national petroleum and gas company operating as a market participant is an agency or instrumentality. *NML Capital, Ltd. v. Republic of Argentina*, 892 F. Supp. 2d 530, 533-34 (S.D.N.Y. 2012) ("*NML II*"). Similarly, another district court determined that the *Caisse de Dépôts et Consignations* — a public depository that operates much like a bank — was an agency of the French state. *NXP Semiconductors USA, Inc.*, 2014 WL 4621017, at *8; *see also Freund v. Republic of France*, 592 F. Supp. 2d 540, 545-46, 550-51, 555 (S.D.N.Y. 2008) (describing the *Caisse de Dépôts et Consignations*).

A national space agency does not fall clearly within either of these paradigms.[6] Space exploration and scientific research are not as integral to statecraft as war and diplomacy. Nor are they traditionally associated with commercial enterprise. The Court is therefore left to apply *Cubic*'s core functions test — which examines both the structure and function of an entity — without suggestive comparison.

Structurally, CONAE resembles a government entity. A board of directors runs CONAE, but eight of its nine members are government officials. And although CONAE professes to be administratively and financially independent, it reports to the Ministry of Planning and Infrastructure as well as the Argentinian President, prescribed government officials can veto its external affairs, and it relies (at least in part) on the legislature for funding.

---

[6] At the outset, the Court cannot accept the complaint's allegations that CONAE is a political subdivision of Argentina whose core functions are commercial. Those allegations are legal conclusions, not well-pled facts, and cannot be credited under *Twombly* and *Iqbal*.

9

CONAE's functions also are more similar to a governmental entity's than a commercial enterprise's. CONAE's primary function is the development and execution of a national space program; national programs are usually, by definition, governmental. Furthermore, space exploration and research are traditionally associated with governments (even with the advance of private space corporations in recent years).[7] And most importantly, there is nothing *commercial* about CONAE's space program. *Cf. NML I*, 2011 WL 1533072 at *2, 4-6 (finding the core functions of AR-SAT — a telecommunications provider created by Argentina that used satellites to provide television, telephone, and internet networks for a fee to public customers — were predominantly commercial).

On balance, CONAE's core functions are governmental. Its structure resembles a government wing more than a private corporation, and, most importantly, its focus is directed toward governmental objectives, not commercial ones. Since CONAE is therefore a political subdivision of Argentina — at least for purposes of jurisdictional immunity — the state's waiver speaks for it as well. Thus, NML has shown that CONAE waived its Section 1604 immunity, and this Court possesses subject matter jurisdiction.[8]

### B. Attachment Immunity

Because NML seeks to attach property, it must overcome a second layer of presumptive immunity: execution immunity under 28 U.S.C. § 1610. *See also NML III*, 134 S. Ct. at 2256.

---

[7] Some of CONAE's ancillary functions further corroborate its governmental nature. For example, CONAE implements treaties, which is a governmental function. *See, e.g.*, *Government of Jamaica v. United States*, 770 F. Supp. 627, 631 (M.D. Fla. 1991) ("[Q]uestions of treaty interpretation, clarification and implementation are functions necessarily carried out by the executive branch of government.") (citations omitted).

[8] *Cubic* arguably can be read to adopt a modified version of the core functions test whereby the answer produced by the traditional core functions test only creates a presumptive answer. *See* 495 F.3d at 1035 & n.10. *Cubic* oscillated between referring to it as a "strong presumption" and a (presumably normal) "presumption." *Id.* at 1035-36. And it is unclear whether the presumption was strong as applied to the case's facts or whether the presumption is always strong. Regardless, the Ninth Circuit then discussed *Bancec*'s factors and concluded that the presumption stood. *Id.* at 1036. The Ninth Circuit cautioned, however, that even a full *Bancec* showing may not overcome the core functions presumption. *Id.* CONAE is not primarily responsible for its own finances though, so it falls short of meeting all the *Bancec* factors. *See* 462 U.S. at 624. Thus, CONAE is an agency or instrumentality even under a modified core functions test.

Subsection (a) — which applies because CONAE is a political subdivision — immunizes a foreign state's property in the United States unless the "property is or was used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). In this circuit, the phrase "used for" is interpreted narrowly. *Af-Cap Inc. v. Republic of Congo*, 475 F.3d 1080, 1091 (9th Cir. 2007); *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 257 & n.5 (5th Cir. 2002); *Spaceport*, 788 F. Supp. 2d at 1120. So "[w]hat matters under the statute is what the property is 'used for,' not how it was generated or produced." *Af-Cap*, 475 F.3d at 1087. And property is only "'used for a commercial activity in the United States' when the property in question is put into action, put into service, availed or employed for a commercial activity, not in connection with a commercial activity or in relation to a commercial activity." *Id.* at 1091. Importantly, this definition does not encompass property "that '*will* be used' or '*could potentially* be used' for a commercial activity," *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) — rather, "the property must be in 'active employment for commercial purposes' at the time the writ of attachment or execution is sought." *Spaceport*, 788 F. Supp. 2d at 1120 (quoting *Af-Cap*, 475 F.3d at 1088).

Under this definition, NML failed to allege *use* for commercial activity. NML tried and failed to seize CONAE's satellites in a prior lawsuit. *Spaceport*, 788 F. Supp. 2d at 1115-16, 1127. Having disclaimed that theory, NML now eyes "Argentina's valuable contractual rights under its launch services contracts." (Compl., ¶¶ 3, 38). NML alleged that the Launch Service Rights are or were used for commercial activity because they were acquired in a commercial transaction and SpaceX maintains an open launch slot as a result. But acquisition and maintenance are insufficient.

First, CONAE's acquisition of the launch rights through contract is immaterial. To reiterate, "[w]hat matters under the statute is what the property is 'used for,' not how it was generated or produced." *Af-Cap*, 475 F.3d at 1087. Here, the rights were created by contract, which may have been a commercial transaction, but that is irrelevant whether the rights were "used."

Second, the Launch Service Rights were not used to keep launch slots open. SpaceX's

11

1  conduct is nothing more than maintenance in connection with a commercial activity, which is
2  insufficient under *Af-Cap*, 475 F.3d at 1091.  In essence, NML argues that an entity uses its
3  contractual rights by failing to renege on them (i.e., maintaining its ability to perform its
4  obligations at a future date).  NML provides no authority for that proposition, and it is
5  unpersuasive.  *See id.* (emphasizing that use requires the property to be put into service, not
6  merely maintained); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 484 (2d Cir. 2007) (finding
7  that holding funds in an account was not use even though the funds could be applied to debts at a
8  future date).  Indeed, to fit SpaceX's conduct within the definition of "use" requires
9  lexicographical distension of an everyday word.  That would violate both the Ninth Circuit's
10 adoption of a narrow definition, *Af-Cap*, 475 F.3d at 1091, as well as the Court's obligation to
11 apply a straightforward denotation, *see Cubic*, 495 F.3d at 1036 (directing courts to avoid
12 "strained analys[e]s of the words 'used for' and 'commercial activity'"); *cf.* Antonin Scalia,
13 *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some*
14 *Conclusions from the Public-Lands Cases*, 68 Mich. L. Rev. 867, 886 (1970) (cautioning against
15 "formalistic evasion" of foreign sovereign immunity).  Just as satellites are not put into action
16 until they are in orbit, *Spaceport*, 788 F. Supp. 2d at 1121, the Launch Service Rights are not
17 pressed into service until the launch process begins.
18        Thus, there are no allegations that the Launch Service Rights are being "used for a
19 commercial activity *at the time* the writ of attachment or execution [would be] issued." *Aurelius*
20 *Capital Partners, LP*, 584 F.3d at 130.  And since the property is immune from attachment and
21 execution, the complaint fails to state a claim upon which relief can be granted.
22 */ / /*
23 */ / /*
24 */ / /*
25 */ / /*
26 */ / /*
27 */ / /*
28 */ / /*

## IV. Conclusion

Because the Launch Service Rights are immune from attachment and execution under the FSIA, the Court GRANTS Defendants' motion to dismiss the complaint and DISMISSES the case WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: March 6, 2015

STEPHEN V. WILSON
United States District Judge